# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT
## INFORMAL BRIEF



**Case No. 15-3052,**        Henry Uche Okpala v. John Joseph Lucian, et al
14-cv-1443-RGA

**1. Jurisdiction (for appellants/petitioners only)**
A. Name of court or agency from which review is sought:

THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE, WILMINGTON.

B. Date(s) of order or orders for which review is sought:

31 day of July 2015.

**2. Timeliness of notice of appeal or petition for review (for prisoners only):**

Not applicable.

**3. Issues for Review**

**Issue 1.**

The judgment of the District Court is based on a consistent tissue of false and wrong conclusions based on the false scenarios and half-truths, perhaps deliberately invented by the district Court Judge as they are neither supported by written facts and counters submitted by the parties, before the District Court nor by any known facts before the US District Court. These tissues of false and shameful conclusions are stated in the "MEMORANDUM OPINION" issued and signed by the US District Court Judge on July 31, 2015, and on the basis of which the Order to Dismiss with prejudice was based. The Judge obviously either wrongly interpreted the Complaint and responses before him or in the worst case deliberately invented these scenarios for reasons best known to him. No trials, testimony, discovery, or any form of depositions had been conducted in the case before the Judge entered his perverse judgment that is based on this tissue of shameful false conclusions, and half-truths.

The deliberately false and half-truth conclusions include:

### "BACKGROUND"

I "Okpala leases from Defendant John Joseph Lucian a townhouse for a one year term beginning May 1, 2007 ..." - A deliberate half-truth as the facts are that Okpala (the Appellant) leased from appellees/defendants John Joseph Lucian and John Edward Lucian a townhouse for a one year term

beginning May 1, 2007. At the end of the one year term, as provided in the written contract, the lease became a monthly lease that could be terminated by either party by one month notice to the other party. The judge had no basis to either deliberately alter the terms of a written contract he did not inspect, or to deliberately distort important provisions of the lease or contract duly entered into by the parties. Mr. John Joseph Lucian, 1st appellee, simply acted on behalf of himself and his partner, 2nd appellee, whom 1st appellee said was the resident in the state of Florida, so could not attend the signing of contract, but assured Appellant that he, 1st appellee was acting on behalf of himself and 2nd appellee. 1st appellee thus clearly informed Appellant concerning joint and equal ownership of the property by the 1st and 2nd appellees/defendants.

ii. ***"Okpala disagreed with the manner of the cleanup and restoration and withheld rent "***- Another false and shameful "invention" by the District Judge. There was never any attempt at restoration by appellees or "landlords" and insurance provider. The only effort was a "half-hearted cleanup" which is at the center of this case, as the wetted rugs were ripped off leaving a network of tens or even hundreds of thousands of rusted anchor nails that exposed Appellant and family to a very dangerous environment of which neither the appellees, nor any Caucasian family will subject their pet dogs or cats to. The so called cleanup was half-hearted, and there was no attempt at "restoration" during the period Appellant and his family were resident in the property - except for the "restoration" of the water sprinkler system.

iii. ***"On October 18, while Okpala was cooking, a kitchen fire occurred at the townhouse. (id at 4-5 ---) The fire caused extensive damage to the townhouse and Okpala needed temporary housing"***

These are tissues of shameless and deliberate false statements and conclusions by the Judge. There was no fire at the property on the said October 18, 2013 but rather smoke from cooking caused the water sprinkler system to trigger while Appellant/Plaintiff was cooking. Appellant did not know how to shut off the water supply and hence the water sprinkler system. This caused an enormous amount of water to sprinkle and drench 2 floors out of the 3 floors of the townhouse. Appellant called 911 on failing to discover the valves to shut down the water system. The 911 operator immediately ordered Appellant to exit the townhouse, despite repeated assurances by Appellant that there was no danger to himself or anyone else, as only the water sprinkler system was pouring a huge amount of water. Appellant had to exit the property, as ordered by the 911 operator, and waited outside the property until the fire fighters summoned by the 911 operator arrived. The fire fighters shut down the water sprinkler in only a few seconds. Nearly all the damages to the property were due to the enormous amount of water sprayed by the sprinkler on the 2nd floor – drenching and flooding the 1st and 2nd floors of the 3-floor townhome.

The claim by this District Court judge that "it appears that Liberty Mutual had the property cleaned and restored by Service Master Restoration." Is a deliberately and shameful assertion by the District Court Judge, as there was neither any attempt by any party to "restore" the property while Appellant lived in the property, nor did any of the submissions made by any party state so. So this false assertion is only a misunderstanding or worse still a shameful invention by the District Judge.

The uncontroverted truths are:

i. Appellant contacted John Joseph Lucian (1st appellee/defendant), immediately on arrival of the fire fighters above, and informed him of the ongoing events. In reaction, 1st appellee informed Appellant that from thence onwards his partner John Edwards Lucian, 2nd appellee, would take charge of all issues regarding the property and rental contract on behalf of the "landlords".

ii. The next morning the 19th of October, John Edwards Lucian, called Appellants and assumed total control of events.

iii. On the same 19th of October, an officer **Service Master Restoration**, the 4th appellee, arrived and informed Appellant that the 4th appellee had been contracted by the "landlord" to remove the drenched and wet rugs covering the lower 2 floors of the 3 floor townhouse, and then dry the floors.

iv. 4th appellee proceeded to remove the rugs on the 2 floors and connecting stairways. Despite strong protestations by Appellant, officers of 4th appellee refused to remove the network of tens or even hundreds of thousands of rusted nails used to anchor the rugs on these lower 2 floors and connecting staircase. The agent of 4th appellee assured the Appellant that new rugs will be laid as soon as the floors are dry. The agent said the floors would be dry in less than 7 days, and new rugs would be laid immediately after. 4th appellee moved in over 40 pieces of equipment that operated 24 hours daily for 7 days to dry the property. The cost of electric power for this entire operation was borne by Appellant and appellees have refused to reimburse Appellant any of such costs.

v. An officer or agent of 3rd appellee, Liberty Mutual visited the property to assess the situation on or about the 22nd of October 2013. This officer advised Appellant to move out of the property with his family, perhaps to become homeless, due to the clearly dangerous situation he saw - a family exposed to tens or even hundreds of thousands of rusted nails on 2 floors and connecting stairways of a 3 floor townhome. Appellant requested a

|      | |
|------|---|
|      | commitment from 3rd appellee for reimbursement of hotel accommodations for Appellant and family, so Appellant can move out as advised by this officer or agent of 3rd appellee. Agent of 3rd Appellee advised Appellant to request temporary hotel accommodation from his clients – 1st and 2nd appellee. |
| vi.  | On about October 26th, 2013 2nd appellee called Appellant by phone, caller shown as "UNKNOWN", and verbally gave Appellant notice of termination of lease by end November 2013, as required by the rental contract. Appellant requested a written notice as enshrined in the rental contract. 2nd appellee assured Appellant that a written notice will be forthcoming, and that, in addition, his attorney will make contact soon with Appellant. |
| vii. | From 26th day of October 2013, onwards 1st and 2nd appellees consistently failed to "pickup" phone calls from Appellant. All attempts by Appellant to complain and plead with to 1st and 2nd appellees regarding the unhealthy and very dangerous condition Appellant's family was exposed to, due to failure to replace the rugs nor at least remove the network of rusted anchor nails, after the rugs the nails anchored had been removed. |
| viii.| On or about the 28th October 2013, Appellant received an unsigned US Postal Service 1st class mail, purportedly from 1st appellee giving Appellant one month notice of termination of lease, as enshrined in the contract. |
| ix.  | Due to 1st and 2nd appellees ungentlemanly conduct – making calls with caller "UNKNOWN" and the "unsigned" termination notice, Appellant and family decided to vacate the property and the end of the termination notice, as Appellant and family feared for their lives dealing with ungentlemanly "landlords" who had unfettered access to property, in the form of spare keys, and of whom 1st appellee was in the habit of visiting property accompanied by armed men, and now the deliberate exposure to unhealthy and dangerous network of tens of thousands of rusted nails. |
| x.   | Although, for reasons best known to him, this notice of termination by 1st appellee was unsigned, 1st appellee did admit under oath during a testimony in a State of Maryland District Court, that the unsigned letter of "notice of termination of lease" originated from him. |
| xi.  | 1st and 2nd appellees, the property owners or "landlords", never visited the property to access the situation or the conditions under which Appellant and family lived, throughout the events of the Complaints in this case. |

xii.   A technician was sent by 2nd appellee to install a new and/or repair the water sprinkler system. This technician showed Appellant how to shut off the water system and or water sprinkler system to the property in a network of plumbing systems in the laundry room of the property. Had 1st appellee shown Appellant these water "shut off" systems on commencement of the rental contract, as shown by the water sprinkler technician, Appellant would have been able to shut off the water sprinkler on the said 18th October, 2013, with minimal damage to property.

xiii.  It is also on record that 1st appellee had given notice of termination of lease, at least 3 months before these events, according to him, so as to take advantages increased prevailing rents, due to establishment of a casino in the area, less than 3 miles from the property. This created reasonable suspicions of the motivations for the events of the said 18th of October 2013.

xiv.   The termination notice was withdrawn on agreement of a new monthly rent by the parties, but 1st appellee failed to concretize the new agreement by execution of a new contract, as agreed by the parties. This was pending for at least 3 months before the events of this case.

xv.    A few days after the issue of notice of termination of lease, Appellant received notice of a complaint filed in the District Court of the State of Maryland, Anne Arundel by 1st appellee demanding payment of outstanding rent and late fees for October 2013. Appellee obtained judgment for non-payment this complaint.

xvi.   1st appellee filed a second complaint in the same District Court of Maryland Demanding rent for November 2013. Appellant boycotted the scheduled hearing of this complaint.

**xvii.** From this point onwards, for a period of about six weeks remaining, on the lease, by the lease termination notice, issued by 1st appellee, no agent or office of the appellees visited the property to see the dangerous conditions Appellant and family were exposed to nor was there any other iota of effort made to restore or remove the dangerous conditions Appellant and family lived – 3 floors townhome, with the lower 2 floors and connecting stairways covered by networks of hundreds of thousands of rusted nails.

xviii. Only pathologically evil persons will subject and expose a family to six weeks dangerous conditions as Appellant and family were subjected to by appellees simply because Appellant and family are non-Caucasians.

xix. Appellees meet the definition of pathologically evil persons and racists referred to above due, in part, to the ease with which they subjected Appellant and families to evil conditions they will not subject their pets simply because Appellant and family are non-Caucasians.

xx. The appellees had the option, clearly given by Appellant, to simply remove the network of tens of thousands of rusted nails, so that as ugly and inconveniencing that condition may be, Appellant and family would not have been exposed to dangerous life threatening conditions, which the network of rusted nails in the lower 2 floors and stairways of a 3 floor townhome posed.

xxi. Appellant and family had to traverse this dangerous network of rusted nails, several times a day, simply in conduct of regular life.

xxii. Appellant's spouse and children were in particular heart broken by this evil turn of events.

**Issue 2.**

i. The District Judge's assertions regarding jurisdiction are perverse. This case was at the Complaint stage, and the court never even issued a "Scheduling Order" setting a schedule for discovery and depositions.

ii. Had discovery stage and deposition stages been reached Appellant would have clearly shown that Appellant became a resident of the State of Delaware on or about the 7th of December 2013, including filing and payment of Delaware state tax for the year 2013 based on income earned by Appellant in Delaware beginning on the 3rd day of December, 2013. The 2013 Federal, and states of Maryland and Delaware state taxes were filled by Appellant long before the Complaint in this case was filed in either the Circuit Court of Maryland or in the US District Court, Delaware.

iii. In addition Appellant was in fulltime employment in the state of Delaware beginning on or about December 3, 2013, and was resident in hotels in Wilmington DE, beginning from about December 7, 2013.

iv. Appellant entered into a rental contract for an apartment in Wilmington Delaware with effect from January 2, 2014, well before this case was filed in Federal Court.

v. It is settled law that determination of jurisdiction for US Constitutional Diversity cases are determined by the place of domiciles of the parties on the date the action was initiated, rather than the date of occurrence of the events leading to the case.

vi. Being that, on the date this case was filed, Appellant/Plaintiff was resident in the state of Delaware, 1st appellee/defendant was resident in the state of Maryland, 2nd appellee/defendant was resident in the state of Pennsylvania, 3rd appellee/defendant is a corporation which had offices in multiple states including Delaware and Maryland, while 4th appellee/defendant was operating in the state of Maryland, and in Washington DC and maintained offices in the state of Maryland, a perfect case of the US Constitutional Diversity requirement was satisfied.

vii. District Judge's assertion in his memorandum is thus perverse, as all the Appellant/Plaintiff had done was file a Complaint, which on Discovery Stage, Appellant/Plaintiff would have shown evidence related to US Constitutional Diversity requirements.

**Issue 3.**

i. The District Judge's assertions regarding "res judicata" is grotesquely perverse, as law suites are based on formal complaints, and none of the cases District Judge cited in his perverse judgment contained any issues related to this complaint.

ii. A copy of the complaint filed by Appellant in the District Court of Maryland against 1st appellee for return of security deposit, including the counter claim filed by appellee, were submitted and available to the US District Court in this case. On the other hand appellee simply referred to complaints 1st appellee had filed in the District Court of Maryland against Appellant, stating the case numbers.

iii. Shockingly the US District Judge used simple assertions and case numbers to decide on assertions of "res judicata".

iv. The truth is that the 2 cases filed by 1st appellee against Appellant were simply for payment of rents, $1,850.00 each, and late fees, 5% of rent, for the months of October and November 2013. Appellant filed no counters in reaction to the complaints.

v. The US District Judge in this case never saw or requested copies of the complaints filed by 1st appellee against Appellant in MD District Court, although he "generously" quoted the case numbers, as none was submitted to the US District Court by any party at the stage the Judge hurriedly issued his judgement.

vi. The above means that application of the principle of "res judicata" regarding cases that have no relationship in facts with current case is simply the height of perverse decisions by any Judge for reasons best known to the Judge in this case.

vii. Appellants asserts and suspects that the decisions of the US District Court Judge had nothing to do with justice, but more likely application of prejudices, and to satisfy his friends and allies who are attorneys who practice in his court.

**Issue 4.**

a. **Reliefs being requested:**
An Order to:

1. To vacate the perverse decision, Orders and/or judgment of the US District Court for District of Delaware, Wilmington given on 31 July 2015 in relation to the case ***1:14-cv-01443-RGA***.

2. To remand the case to the US District Court for District of Delaware for proceedings.

3. An Order or ***Writ of Mandamus*** recusing U.S. District ***Judge Andrews*** of US District Court for District of Delaware, Wilmington from any further or future participation in this case, ***1:14-cv-01443-RGA*** at the District Court of Delaware, Wilmington due to his conduct, including the

deliberate perverse judgement due in part to his deliberate invention of false scenarios in this case.

b. **Prior appeals (for appellants/petitioners only)**

   A. Have you filed other cases in this Court? Yes [] No [X]

   B. If you checked YES, what are the case names and docket numbers for those appeals and what was the ultimate disposition of each?

Dated: 30th day of October 2015.    Signature: _____
                                     Henry Uche Okpala, Appellant

## CERTIFICATION OF SERVICE

I, Henry Uche Okpala, Appellant in this case, hereby certify that on October 30, 2015 I served a copy of this Informal Brief on all parties, addressed as shown below by US Postal Service mail and/or electronic mail:

1. John Edward Lucian,
   C/O *Blank Rome LLP*
   One Logan Square,
   130 N. 18th Street,
   Philadelphia, PA 19103.
   lucian@blankrome.com
   Attorney for appellees John J Lucian and John E Lucian

2. i. Robert S. Campbell
   Pessin Katz Law, P. A.
   901 Dulaney Valley Road, Suite 500
   Towson, MD 21204-2600
   rcampbell@pklaw.com

   ii. Robert K. Beste, III
   *Smith, Katzenstein & Kenkins LLP*
   1000 West St., Suite 1501,
   P. O. Box 410
   Wilmington, DE 19899
   rkb@skjlaw.com

   Attorneys for appellee *Liberty Mutual Insurance Company*

3. i. Jared T. Green,
   SEITZ, VAN OGTROP & GREEN, P. A
   222 Delaware Avenue, Suite 1500
   Wilmington, DE 19801
   jtgreen@svglaw.com
   Attorney for appellee *ServiceMaster Restoration of Montgomery*

Signature: _____

Henry Uche Okpala, Appellant
henryokpala@gmail.com

9